CROWN CORK & SEAL CO. OF BALTIMORE CITY v. BOND BOTTLE SEALING CO.

(Circuit Court of Appeals, Third Circuit. November 3, 1915.)

No. 1943.

PATENTS &#8580;328—INFRINGEMENT—MACHINE FOR MAKING BOTTLE CLOSURES.

    The Wheeler patent, No. 887,883, for an apparatus for the manufacture of bottle closures, *held* valid, but, in view of the prior art, not infringed by a machine which, in forming the closures, adds the cork member to the other two assembled and heated members, under pressure and without having been heated.

Appeal from the District Court of the United States for the District of Delaware; Edward G. Bradford, Judge.

Suit in equity by the Crown Cork & Seal Company of Baltimore City against the Bond Bottle Sealing Company. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 217 Fed. 891.

James Q. Rice, of New York City (C. J. Sawyer, of New York City, of counsel), for appellant.

Melville Church, of Washington, D. C., and Marshall A. Christy, of Pittsburgh, Pa., for appellee.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

WOOLLEY, Circuit Judge. This is an appeal from a decree of the District Court of the United States for the District of Delaware, dis-

missing the complainant's bill of complaint, which charged the defendant with infringement of certain letters patent owned by the complainant, relating to the manufacture of "Crown Caps" or closures for sealing bottles containing liquids. The bill charged infringement of three Letters Patent, being No. 792,284, granted June 13, 1905, to the complainant as assignee of William Painter, for Methods or Process of Manufacturing Bottle Closures; No. 887,838, granted May 19, 1908, to the complainant as assignee of William Painter, for Machine for Making Closures for Bottles; and No. 887,883, granted May 19, 1908, to the complainant as assignee of William H. Wheeler, for Apparatus for the Manufacture of Bottle Closures. At the trial, the complainant abandoned the charge of infringement of the two Painter patents, and restricted its charge to claims 1, 4, 6, 7, 23, 24, 25, 26 and 27 of the Wheeler patent, which, together with the inventor's description of his invention, appear in the opinion of the District Court, reported in 217 Fed. 891.

The validity of the patent in suit is not disputed. The defense is non-infringement.

The complainant charges that the defendant's machine produces a Crown Cap or bottle closure of the same design, composed of the same parts, constructed in the same way, and united by the same method and mechanism as the one produced by the machine of the patent in suit. The defendant admits that the closure produced by its machine, both in its parts and in its entirety, is identical with the closure produced by the machine of the patent in suit, but denies that the parts are united by a method or mechanism covered by the patent.

The controversy in this suit relates to the manufacture of the well known "Crown Cap," and involves the mechanism used by the parties in uniting its several known parts. The mechanism relates to the important element of heat employed by both in effecting adhesive union. The complainant assembles three parts of the closure, heats them all while not under pressure, and completes adhesion by cooling them under pressure. The defendant heats two parts of the closure while not under pressure, does not heat the third part at all, or if so, not until after that part is inserted into the cap by pressure, which is maintained during cooling. The controversy relates to the fact of heating the third member by the defendant's machine and the means employed to that end. Before this question can be understood or the issue discussed, it is necessary to recite, with some attention to sequence, the developments of the manufacture of the type of closures to which this suit relates.

The crown cap closure was introduced by the complainant in 1892, and until 1909 was almost exclusively produced by it, to the extent of many million gross annually, under patents presently to be considered.

The basic patent for the crown cap, being No. 473,776, was granted on February 2, 1892, upon an invention of William Painter. This patent is not in the record and has no place in this litigation except to show that the patent upon which the art was based has expired. Though subsequently applied for, there was issued on the same day, upon another invention of Painter, patent No. 468,226, for certain

modifications of the original closure. While the latter Painter patent is not the basic patent of the art, it is the patent that is at the bottom of this controversy. It likewise has expired.

It was disclosed by Painter patent No. 468,226, which, though not precisely accurate, will be conveniently referred to as the original Painter patent, that a crown cap or closure of the type conceived by Painter and now made by both parties to this suit, consists of three members:

1. A thin metal shell having a slightly rounded upper surface and a dependent fluted flange or skirt which locks over a bead on the lip of the bottle, and thus holds it in a sealing position. Throughout the testimony, this member is referred to as the "cap" or "shell."

2. A thin cork sealing-disk which is tightly compressed within the cap or shell, and which, when in use, is pressed down tightly upon the edge of the bottle mouth.

3. A film of an adhesive substance which is interposed between the cork disc and the under surface of the metal shell, the function of which is to cause the cork disc to adhere to the metal shell, so that no metallic taste may be imparted by contact to the liquid contents.

In disclosing the means by which to make such a sealing closure, Painter directed that the metal cap should be coated on its inner side with "an inodorous, tasteless and insoluble liquid-proof material," stating:

"It is to be understood that this resistant or non-corrodible coating need only be a very thin film, and I secure the best results by the use of a *fusible adhesive material*, which is tasteless and odorless—such as thin shellac varnish. * * *

"The combination of a metallic sealing cap *coated inside with a protecting film* and a permeable or porous sealing-disk is a valuable portion of my invention, and especially if the sealing-disk be composed of cork.

"The very hard spots or masses of various sizes and forms found in all ordinary cork will, as hereinbefore indicated, render thin cork disks more or less defective as compressed sealing-disks. * * * I therefore, prior to the application of the disks to bottles, free the disks from said hard spots. In other words, I subject them to a heavy pressure, which breaks or crushes and disintegrates the normally hard masses, * * * *this crushing operation* may be performed prior to the insertion of the disks into the caps; but it is best accomplished *at the time the disk is forced into the cap* the latter having had its interior *already* coated with a film of well dried shellac *and then heated* sufficiently to melt the shellac and render it adhesive. * * *

"A cork disk, as received from the cork-cutting machine, is placed in the cap, *previously coated inside with shellac and well heated* and *then* subjected to heavy crushing pressure in suitable dies, and the edge of the flange is compressed, thereby flattening the inner lower portions of the corrugations and slightly reducing the diameter of the flange at and near its edge. Under this operation, the hard spots in the cork are not only crushed but the cork disk is developed into a concavo-convex form *and it is also well confined in the cap by the melted shellac.*"

Although owning and operating under the original Painter patent and being shown by it the advantage of heating the fusible film in a closure *before* inserting and compressing the cork disk, it does not appear that the complainant ever pursued that method. Between 1892 and the period embraced between 1905 and 1908, which was prior to certain patents granted upon other inventions of Painter and also prior

to the patent in suit, the complainant united the parts of the crown cap by what was known as the oven-baking method. Before the parts were united, they were assembled. A paper disk or collet, bearing upon each side a film of fusible material, was placed within the hollow of the metallic cap, and the cork disk was pressed into the hollow of the cap upon the collet of fusible or binding material. This was done before the binding material was heated or fused, and constituted merely the assembling procedure. With their three parts assembled and in place, the closures were then heated in large quantities in ovens to melt the fusible films on the collet and to cause the cap and the cork disk to adhere. After remaining in the oven a given time at a predetermined temperature, they were taken out and allowed to cool. This constituted the uniting process, and completed the manufacture of the crown cap.

But it developed that in heating the three parts of the closure after they had been assembled, gases would be generated and trapped and held between the members, preventing the union of the members and causing the cork disks to puff, thereby deteriorating their sealing quality. Such defective closures were known as "puffers" and when discovered were discarded as valueless. They comprised about ten per cent. of the product, the remainder being perfectly united by this method. There was thus developed the problem of finding means whereby the several parts of a closure could be firmly and permanently united without entrapping gases between them. While the problem related to but ten per cent. of the entire product, yet as the annual product was figured in millions of gross, the problem was serious.

In 1905, Painter, the pioneer in the art, sought to cure the defect developed in the oven-baking method by a method for which were granted Letters Patent No. 792,284. Under this method, the several parts of the closure were assembled as before. The assembled or "composite closure" was then put under pressure, and while under pressure, was passed through a raceway over a series of burners and heated, and while still under pressure, was passed over cold air jets and cooled. The distinctive characteristics of this method were heating under pressure and cooling under pressure a previously assembled closure.

While this patent was pending, Painter applied for another, and on May 19, 1908, was granted patent No. 887,838 for an improved machine for carrying out the method described by patent No. 792,284. It added nothing in point of method disclosure to the patent to which it related. It was for a machine by which the closure was first assembled, then pressure applied, and while under pressure the closure was heated and then artificially cooled. Neither of these patents, it is said, was commercially successful. At all events, they were not extensively used by the complainant which owned them. Heating and cooling the assembled members of a closure while not under pressure, as pursued in the oven-baking process, and heating and cooling the assembled members of the closure while *under* pressure, as in Painter's 1905 method patent, left still open and unsolved the problem of causing the assembled members of a closure to adhere without trapping air and gases, and without producing puffers.

Aware of the disclosures of the art and of Painter's patents of 1905 and 1908, William H. Wheeler approached the problem and solved it by an invention for which the patent in suit was granted May 19, 1908, being Wheeler patent No. 887,883. This patent is for·a machine and not for a method or process. It is in fact a patent for only a part of the machine by which complainant manufactures crown caps, the other part being constructed under a previous patent, being Wheeler patent No. 798,549, for a machine known as a "Crown Cork Feeder." The two parts constitute the whole structure by which the complainant assembles and unites the members of its closure. While the Wheeler patent No. 798,549, is not in suit, its function, though not its structure, has a relation to the structure and function of the patent in suit that requires a brief consideration. This patent is for an assembling machine and nothing more. In this machine, the three members or parts of the crown cap are assembled, that is, the metallic shell is fed to the machine, the fusible collet is placed in the shell, the cork disk is placed in the shell and pressed upon the fusible collet, and the shell is crimped so as to hold the interior members in place. By this machine, no heat is used and no attempt is made to fuse the fusible member and unite the parts. This assembling device performs no function in uniting the members of the closure. It assembles them, and after assembling them, feeds or delivers them to any machine to be united by any method.

In 1908, Wheeler invented the uniting machine, which is the machine of the patent in suit. The aim of Wheeler, by this invention, was to provide a "construction for the *uniting* of the *assembled members* of the closure, which may be added to existing forms of assembling machines," making special reference in the patent to the assembling machine covered by his patent No. 798,549, granted in 1905. Owning both patents, and intending to carry out this idea, the complainant connected the two machines, placed the uniting machine of the patent in suit beneath the Wheeler assembling machine of 1905, and operated them in conjunction. This is important, because the one device of the defendant is both an assembling and uniting machine, while the structure of the complainant is composed of two machines, made under two patents, one of which is an assembling machine under a patent not in suit and therefore not infringed by the device of the defendant, the other of which is a uniting machine under the patent in suit, and to the extent the defendant employs its means, may be infringed by the device of the defendant.

The complainant's machine is described in detail in the Wheeler patent, and only so much of it will be here described as is necessary for comparison with the mechanism and function of the defendant's machine.

After the three members of the closure are assembled in the upper assembling machine of the type of the first Wheeler patent, the "composite closure" produced by that machine, descends through a chute into a heating chamber of the machine of the patent in suit. In this chamber, as in the oven of the old oven method, the entire closure is subjected to a temperature of 320 degrees F. for a period of thirty

seconds, thereby fusing the adhesive member, which melts at 160· degrees F., and thoroughly heating the cork disk member, whereby gas is generated and accumulated between the layers. As the closures descend from the assembling machine and enter the uniting machine, they are successively deposited in inverted position upon the floor of the heating chamber, which is provided with a number of radial grooves for the closures and is continuously rotated. Upon the lower face of the stationary roof of the chamber is a spiral rib that engages the upwardly turned edges of the closures. As the floor rotates, the stationary spiral rib causes the closures to gradually move in their grooves outwardly until they are delivered in succession from the heating chamber or oven upon an artificially cooled ring secured to and rotated with the floor of the heating chamber.

On the surface of this cooling ring are pockets for the closures corresponding with the radial grooves in the floor of the heating chamber, and above each pocket is mounted a plunger, being one of a series of plungers that rotates with the cooling ring. A fixed cam track is provided for the plunger and holds each plunger elevated until, in its transit, it is immediately above a pocket containing a hot assembled closure. Then the plunger is forced down into the closure upon the cork disk, compressing it firmly and holding its three parts under pressure "during almost a full revolution of the machine" and until the opposite end of the cam is reached, when the plunger is elevated and the cooled closure discharged.

The theory of the operation by which Wheeler solves the problem of trapped air and puffed closures appears repeatedly throughout the specification and claims of his patent. It involves uniting in perfect union the members of a closure previously assembled by the machine of the Wheeler patent of 1905, being No. 798,549, or by an assembling machine of any other type. The organization or means employed by the patentee to effect perfect union are several:

1. Heat is the first element employed. Eight of the nine claims of the patent provide means for heating the whole closure, that is,· means "for heating the *assembled members* of the closure," of which the cork disk is one. The patentee states and reiterates the importance of heating the cork disk as well as heating the fusible collet. He states that—

"the *assembled parts* of the closure are subjected to heat while in the condition in which they leave the dies of the assembling machine," and that "heat is employed to soften or fuse the protecting or binding medium located between the packing or sealing gasket and the metal cap, and after the *parts are thoroughly heated* they are allowed to cool."

He provides an arrangement—

"in which the heating action *on the members* of any one closure may be continued a sufficiently long time to thoroughly soften the binding material and to *drive out any moisture or air in the material* or between the members."

2. Having provided for thorough heating of every member of the entire closure, Wheeler directs that the heating shall be accomplished while the closure is *not* under pressure, distinguishing his conception from Painter's 1905 method. He states:

"*During the heating action* of the *parts* they are *not* subjected to pressure or to any action which would tend to confine any moisture or air which may be *in the material* or in the *pit-holes or crevices thereof* or pocketed between the members of the closure, but on the contrary, the *assembled parts* are left entirely free for the escape of any moisture or for the escape of the air in expanding."

Thus far he provides means for *heating* the entire closure while *not* under pressure.

3. The remaining means disclosed by Wheeler to produce the adhesive union of the parts of a closure, relate to cooling the heated closure while under pressure.

Wheeler's patent was a success. He solved the problem of trapped gases in assembled closure.

This was the state of the art when the defendant chose to enter it. To what was the defendant entitled? It was entitled to make a crown cap in design and of members and material identical with that made by the complainant, the patent covering such a cap having expired. It was free to make it in the way disclosed by Painter, the original inventor, because Painter's monopoly ended with the life of his patent, and his invention then belonged to the world.

Upon entering the art, with what was the defendant confronted? While it was free to unite an assembled closure without pressure by the old unpatented oven method, it was confronted with the known faults of that method. It was likewise confronted with the Painter patents of 1905 and 1908, which, for whatever they were worth, prevented it uniting the parts of an assembled closure by heating and cooling them under pressure. Wheeler's assembling patent of 1905 was a barrier to the use of the best known method of assembling the parts of a closure, and Wheeler's uniting patent of 1908 foreclosed to the defendant the method of uniting the parts of an assembled closure by heating while not under pressure and by cooling while under pressure. In a word, the entire art as disclosed by the defective oven method and the later Painter and Wheeler patents, contemplated uniting by heat, either with or without pressure, the parts of a previously assembled closure, and these were the only known methods of uniting the parts of a closure, unless, indeed, the original Painter patent disclosed another. So, upon entering the art, the defendant found that all known means for solving the recognized problem of entrapped gas in assembled closures were either defective or pre-empted. What did the defendant do? The known mechanism to solve the great problem being forbidden it, the defendant set about to devise a mechanism that avoided the problem to which the mechanism of its predecessors related, and in doing this it went back to the original Painter patent long expired. From that master of the art the defendant learned several things, that in order to unite the members of a closure, it was not necessary to assemble and bind them together before heating them; that in fact it was not at all necessary to heat every member; that the fusible member alone might be heated before inserting the cork member, and that after heating the fusible member, the unheated cork member might be compressed upon the fused member, and a

union established. But it is contended that Painter's method did not effect perfect union. That may be true, and if the defendant followed Painter, the union effected by its machine may likewise be imperfect. But this is unimportant, if the defendant followed Painter, for the defendant was free to employ Painter's method, whether the union it produced was perfect or defective. It is also contended that in disclosing his method, Painter did not state that his purpose was to prevent the trapping of gases and the puffing of closure, yet if Painter's method did prevent such trapping and puffing, the defendant was free to follow it whether Painter intended it or was ignorant of it, if the defendant followed it by means not patented by Wheeler. It is insistently urged that while Painter disclosed an order and method for uniting the members of a closure, he disclosed no means to carry his method into practice. This is unimportant, if the defendant followed the steps in Painter's order by means of its own.

And lastly, the defendant is charged, not with infringement of a patented method of the complainant, for it had none, but with appropriating and infringing the mechanism of the Wheeler patent to make effective the method it employed. Here we reach the real issue.

What is the mechanism by which, in one machine, the defendant assembles and united the parts of a closure?

In the machine of the defendant, the empty metal shells are placed in an inverted position upon a rotating dial. This dial carries the shells through a raceway, and delivers them one by one to successive pockets in a second rotating dial, which brings the shells in succession beneath a device for cutting the fusible adhesive substance and placing the collets within the shell. Each shell, with a collet of fusible adhesive substance loosely placed within it, is carried around by the same dial until it strikes an incline by which it is shunted into one of the pockets of a third rotating dial, each successive shell containing its adhesive substance thus passing from one dial to the other. The shells on the third dial are carried in succession under a device for heating the adhesive substance so as to soften it. This heating device is simply a blow-pipe burner, having three downward jets, which play but an instant upon the fusible collets as they pass beneath them. Gases generated by the heat pass freely into the air, as the cork disk has not as yet been placed in the shell to bind or entrap them. As the shells pass in succession from under the burners, the adhesive substance in each now being fused and the gases therefrom escaping in transit, they are again deflected into pockets of another rotating dial, which is the fourth and the last dial upon which the closures are placed. Over this dial is suspended a pile of unheated cork disks held in an upright tube. The cork disks descend and pass one at a time into pockets in the surface of a rotating carrier, by means of which they are brought in succession to a point immediately over the path of the metal shells containing the fused binding material. A battery of plungers is provided, one plunger arranged above each pocket of the dial carrying the shells with their fused adhesive material. This battery rotates with the dial at the same speed. Neither the dial upon which the closures are last placed nor the battery of plungers

is artificially cooled. A cam track serves to hold the plungers elevated until it ends abruptly at a point where a suspended cork disk and a metal shell beneath come for an instant into alignment. As the head of the plunger runs off the cam track, a plunger is snapped down, causing it to instantaneously drive or thrust the cold cork disk into the metal shell upon the previously heated and softened adhesive substance and the plunger remains in its depressed position for a period of "somewhat less than three seconds" "until the plunger has made about half a revolution" and reaches a point where it rides up on the cam track and releases the now cooled and finished closure.

No one of the elements in the mechanism or organization of the complainant's machine is independently patented by the Wheeler patent. That patent is for an organization or apparatus intended to start with a given product, and by a certain orderly procedure or succession of steps to accomplish a given result. It starts with an assembled closure. Therefore, it starts with the problem which every such closure carries shut up within it.

The machine of the defendant likewise comprises an organization or apparatus intended to accomplish a given result by a certain, and, it is claimed, by a different procedure or succession of steps. It starts not with an assembled closure, in every one of which is inclosed a problem, but with only one member of the closure, which is the open shell. This is the first step of assembling in the defendant's machine. It then places a fusible collet within the hollow of the shell. This is the second assembling step. To this point there is no question of infringement, because to this point the defendant has done nothing but assemble two members of the closure, while Wheeler's uniting machine starts with the whole closure assembled.

The first step under the Wheeler patent is the application of heat, which is the third step in the order of things pursued by the defendant. Wheeler heats for thirty seconds, at a temperature of 320 degrees F., the three members of the closure, and for different purposes. He heats the collet to fuse the adhesive, and he heats the cork disk to expel gas from its interstices and to make it more readily adhesive. By its third step, the defendant heats the fusible collet likewise to melt the adhesive. It heats it while it is in transit and but for an instant, using but a fraction of a second instead of the thirty seconds. It therefore employs a higher temperature. It does not directly heat the cork disk at all. Whether it heats it indirectly for the several purposes for which Wheeler heats it and by means equivalent to those employed by Wheeler, is the heart of this controversy.

The complainant contends that the defendant heats the cork disk to the same temperature, by substantially the same means, and for the same purposes as Wheeler heats it, and that it heats both the fusible collet member and the cork disk member while not under pressure, which is the essence of the Wheeler patent, contending that in heating the shell and fusible collet under a temperature of between 2,000 and 2,500 degrees F. and passing them while so highly heated under a cold cork disk suspended but three-eighths of an inch above them, the

cork is heated by radiation to the point at which the cork disk is heated in the Wheeler heating chamber before it is compressed by the plunger into the molten fused adhesive. The complainant claims that in heating the fusible collet and then an instant later heating the cork disk by radiation from the collet, instead of heating the two together as in the Wheeler patent, there is a change in time and location of the heating of the two members that makes the difference in the defendant's procedure wholly one of form; that it utilizes the function of the Wheeler device and appropriates the substance of that invention in heating both the collet and the cork before pressure is applied.

This argument is somewhat weakened by the further contention of the complainant that any deficiency in heat transmitted to the cork by radiation is supplied by contact with the fused collet when the cork is driven upon it by pressure of the plunger. The Wheeler patent does not include but expressly disclaims heating under pressure.

Recognizing that the mechanism of every machine patent, whether broad or narrow, is entitled to some range of equivalents, and comprehending that the heating of the cork member, as well as the other members of the closure, before pressure is applied, is the essence of the Wheeler invention, we must inquire first whether the defendant heats its cork member, and, if so, whether it heats it in the way and for the purposes disclosed by Wheeler.

Under the Wheeler patent, the cork member is heated in an asbestos lined heating chamber for a period of thirty seconds at a maintained temperature of 320 degrees F. It is so heated for two purposes: First, to make it readily adhesive when brought in contact with the molten adhesive medium; second, to expel air and gases from its crevices. It is heated on its upper and lower sides and through and through.

The defendant's device has no mechanism for heating the cork disk. But it is charged that it heats it, nevertheless. The fusible collet is passed under three gas jets of a temperature of from 2,000 to 2,500 degrees F. It is claimed by the complainant that the collet is subjected to this extraordinarily high temperature so as to carry to the cold cork the quantity of heat it would receive in the Wheeler heating chamber in thirty seconds. Every dial of the defendant's device is continuously in motion. No arrangement is made or is possible by which the collet can be slowly heated under low temperature; the very speed with which it passes the heating point, which is a fraction of a second, requires heat of a high temperature to fuse the adhesive and keep it fused while it passes through the air to the point where it receives the cork disk. So a very high temperature is applied. What happens from the instant of the application? When the shell, with its fused collet, passes from beneath the flames it begins instantly to cool. It passes from the heating dial to the compressing dial, and travels some distance with the molten adhesive exposed to the temperature of the open air, until it reaches a point immediately beneath and in perfect alignment with a cold cork disk, which is instantly thrust down into the molten mass. At this point pressure begins, and the complainant's claim of a patent monopoly for heating without pressure ends.

Although the heated collet continues its transit and does not stop an instant anywhere, it cannot be denied that during "the very small fraction of a second" the fused collet is beneath the cold cork disk, some heat is transmitted to it by radiation. What heat is thus transmitted reaches principally, if not entirely, the under side of the disk. It certainly does not impregnate the whole disk as is done during the thirty seconds of heating in the chamber of the Wheeler device, and does not heat it to a temperature by which gases are generated throughout the body of the disk and expelled from its cracks and crevices. We are of opinion that what heat is thus transmitted is incidental and without purpose, or, as stated in the testimony, is "a wholly negligible amount," and neither by intent nor result constitutes the step taken by Wheeler in heating the cork disk purposefully, continuously and thoroughly. So much for heating the cork disk *before* impact and pressure. Now, what happens when the plunger thrusts the relatively cold cork disk into the fused material of the collet? The answer may be the same thing that happened when Painter, in 1892, thrust a cold cork disk into the fused adhesive material. Of course, some heat is transmitted from one to the other. No cold substance can be thrust against a hot substance without the transfer of some heat units from one to the other; but the heat thus transmitted does not permeate the cork disk and drive out the gases from all of its cracks and crevices, which was the cardinal thing intended by Wheeler in heating the cork disk for a long time. The heating of the cork disk by contact with and pressure upon the fused adhesive, whatever the temperature may be, is no help to the complainant in this litigation, for it produces a condition not only inconsistent with the claims and description of Wheeler's patent, but distinctly condemned by Wheeler, who particularly pointed out that—

"if the pressure takes place before or *simultaneously* with the heating, any air contained in the pit-holes or crevices of the packing (i. e. cork disk) or between the members of the closure, or any moisture present on or about the members (i. e. cork disk) may, by expanding, tend to separate the parts and prevent them from uniting perfectly under continued pressure."

If the cork disk in the defendant's device is highly heated by compression into the fused adhesive, such heating *under pressure* might be claimed to be equivalent to heating under the pressure disclosed by the Painter patents of 1905 and 1908. As these have been withdrawn from this suit, and as heating under pressure is distinctly disclaimed by the patent in suit and declared by the patentee to be an improper method of heating the cork disk, no infringement can be found in the defendant's device in so far as heating is effected at the instant of pressure and subsequently thereto.

That the cork disk in the defendant's device is not as highly heated as the cork disk in the complainant's, is further proven by the testimony that notwithstanding the much higher temperature to which the defendant's adhesive is for an instant subjected, it takes "somewhat less than three seconds" or "one-half revolution of the plunger" at atmospheric temperature, to cool the whole closure, while in the complainant's machine, it takes "almost a full revolution of the plunger"

artificially chilled by sprays of cold water or jets of compressed air to cool the closure.

We are of opinion that Wheeler intended to heat the cork disks thoroughly, as stated by him in his specification, and that the defendant did not intend to heat them at all, except at the instant of impact as disclosed by Painter. In the defendant's device, when the plunger thrusts the cork disk into the shell, it completes its last step of assembling and performs its first act of physically uniting the parts of the closure. In other words, in assembling the closure, the defendant stops where Wheeler starts, and in uniting the closure, both stop by continuing the applied pressure for the purpose of cooling. Therefore, it seems to us that the defendant has not employed the complainant's heating means either to the extent in which Wheeler uses it, upon the parts which Wheeler requires, or for the purpose which Wheeler discloses. The defendant cannot be charged with appropriating the complainant's heating means.

The question remaining is whether the defendant can be charged with infringing the Wheeler cooling means. Both the complainant and the defendant employ means for cooling closures under pressure. The original Painter patent followed by the defendant provided for pressing an unheated cork disk upon hot adhesive matter in order to secure union by adhesion, but did not disclose the advantage of continued pressure during cooling. In the Wheeler device the plunger that descends to compress the three members of the closure is permitted to remain down for thirty seconds. In the defendant's device, the plunger that drives in place the cold cork disk upon the hot adhesive remains in place "somewhat less than three seconds." In each device, the plunger remains down a sufficient time to effect adhesion. Painter early disclosed the necessity of pressure to produce adhesion.

Wheeler claims no patent upon the plunger device, and of course has no monopoly of the element of cooling. The organization to produce perfect adhesion, for which a patent was granted, included, as one of its steps, means to cool under such pressure, but such means, as a separate or independent invention, were neither patented nor invented by Wheeler. They were embodied in Painter's patented inventions of 1905 and 1908. If in the cooling means of the defendant's machine infringement exists at all, it is infringement of the withdrawn patents and not of the device of the patent in suit.

Our conclusion is that the device of the defendant does not infringe the device of the complainant, either with respect to means for heating or cooling, because in entering the art the defendant avoided the problem of the complainant by avoiding a practice that created the problem. It is presumed to have known what the art disclosed. Among other things, the art disclosed the problem of entrapped gases between members of an assembled closure. It proceeded to assemble the members of a closure in an order and to heat the one member that required fusion at a time when gases could not be entrapped and when they were free to escape into the air. In thus avoiding the problem, the defendant avoided the necessity of solving it and established an order of assembling and uniting the members of the closure entirely

different from that employed by Wheeler, and precisely like the order disclosed by Painter in his original patent, so far as the number of the steps disclosed by Painter was used by the defendant.

We find nothing in the litigation in the Second Circuit concerning the Wheeler patent that bears upon or is decisive of the issue in this case, excepting so much of the decree as affirms the validity of the Wheeler patent. We likewise hold the patent valid, but also hold that it is not infringed by the device of the defendant.

The decree below is affirmed.